UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSIAH HUNTER,

                Plaintiff,

      v.

CITY OF FEDERAL WAY POLICE
OFFICER KRIS DURELL,

                Defendant.

CASE NO. C16-1445-MJP

ORDER DENYING DEFENDANTS'
MOTION FOR A NEW TRIAL AND
MOTION FOR JUDGMENT AS A
MATTER OF LAW

THIS MATTER comes before the Court on Defendants' Motion for a New Trial (Dkt.
Nos. 103, 129) and Motion for Judgment as a Matter of Law (Dkt. Nos. 102, 130). Having
reviewed the Motions, the Responses (Dkt. Nos. 111, 112, 135), the Replies (Dkt. Nos. 122,
123), and the related record, the Court DENIES the Motion for New Trial, DENIES the Motion
for Judgment as a Matter of Law, and reduces the punitive damages award to $360,000.

**Background**

On the night of September 14, 2014, a confrontation occurred between Plaintiff Josiah Hunter and Federal Way Police Officer Kris Durell.  The events of that night are considerably disputed but, by all accounts, ended with Mr. Hunter being placed in a Lateral Vascular Neck Restraint ("LVNR") by Officer Durell.  Mr. Hunter brought this civil rights action against Officer Durell, the City of Federal Way, and the Federal Way Police Department.  After a six-day jury trial, the jury returned a verdict in favor of Mr. Hunter on his Fourth Amendment excessive force claim.

### I. The September 14, 2014 Incident

At trial, the jury heard the following relevant testimony:  Earlier in the evening, after playing videogames with friends, Mr. Hunter and his friend Mr. Beausilien drove to the Arco AM/PM at the intersection of South 320th Street and Pacific Highway South in Federal Way, Washington (the "AM/PM").  (Dkt. No. 115 at 200:23-201:20.)  Mr. Hunter purchased a cigar from the store.  (Id. at 150:11-14, 201:25-202:2.)  After smoking the cigar, the two friends got back into Mr. Hunter's car where they continued talking and catching up.  (Id. at 150:21-24, 202:8-23.)  As they were about to leave, their conversation was interrupted by a loud crash.  (Id. at 151:1-3, 202:22-203:4.)  Mr. Hunter and Mr. Beausilien got out of the car to see where the sound had come from and observed the aftermath of a head-on collision—two trucks in the intersection, one smashed against a light pole in front of the AM/PM.  (Id. at 203:5-19.)  Mr. Hunter and Mr. Beausilien ran to the scene of the accident to make sure no one was injured.  (Id. at 151:17-20; Dkt. No. 116 at 5:13-21.)  As they approached the closest vehicle, they observed that its driver, Mr. Wells, appeared to be intoxicated—he was stumbling, slurring his speech, and when he opened the truck door, Mr. Hunter and Mr. Beausilien observed open beer cans on the

floor.  (Dkt. No. 115 at 154:13-14; Dkt. No. 116 at 7:1-14.)  In an effort to help, Mr. Hunter and Mr. Beausilien began clearing debris from the roadway and directing traffic around the accident scene.  (Dkt. No. 115 at 152:12-153:16; Dkt. No. 116 at 7:16-8:16.)  At that point, another car pulled up behind Mr. Wells' truck.  (Dkt. No. 116 at 9:11-18.)  The driver of that car, Mr. Anderson, commented that he was "off duty" and instructed Mr. Hunter and Mr. Beausilien to retrieve Mr. Wells, who had started to walk away from the scene, and to "keep an eye on him." (Dkt. No. 115 at 152:3-9; Dkt. No. 116 at 10:10-24, 78:15-18.)  Believing that Mr. Anderson was an off-duty police officer, the two friends escorted Mr. Wells back to the scene, where a crowd of onlookers had gathered.  (Dkt. No. 116 at 11:11-21.)

At approximately 9:24 PM, Officer Durell arrived on scene, the first of the responding officers.  (Dkt. No. 117 at 120:6-10.)  Officer Durell observed Mr. Hunter and Mr. Beausilien escorting Mr. Wells back to the scene.  (Id. at 65:12-14.)  He approached the group and asked Mr. Hunter and Mr. Beausilien if they were involved in the accident.  (Dkt. No. 115 at 166:25-156:6; Dkt. No. 116 at 13:10-19, Dkt. No. 117 at 66:24-25.)  As he would later write in his report, they "denied being the passengers."  (Dkt. No. 117 at 68:15-17.)  Mr. Wells admitted that he was the driver of the truck, and Officer Durell noticed that he was swaying from side to side and his eyes were bloodshot.  (Dkt. No. 116 at 14:12-14; Dkt. No. 117 at 67:9-10, 72:7-10.)  Officer Durell then placed Mr. Wells under arrest.  (Dkt. No. 117 at 78:9-12.)  As Mr. Wells was being handcuffed, his cell phone and wallet fell out of his pocket and onto the pavement.  (Dkt. No. 116 at 16:12-17:11.)  Mr. Wells asked Mr. Hunter, who was standing just feet away, to pick them up.  (Id.; Dkt. No. 115 at 159:8-12.)  Mr. Hunter reached down to pick up the wallet to give it to Officer Durell, but before he could do so, Officer Durell told him to drop it and step back onto the curb.  (Dkt. No. 115 at 159:17-160:8; Dkt. No. 116 at 17:5-18:24, 46:4-9; Dkt. No. 117

at 80:10-20.) Mr. Hunter complied. (Dkt. No. 116 at 17:5-18:24, 45:12-46:3.) He dropped the wallet and stepped back onto the curb, which was on the property of the AM/PM. (Id.)

Additional officers arrived, including Officer Schmidt. (Dkt. No. 117 at 82:25-83:4; Dkt. No. 118 at 109:11-110:2.) Officer Schmidt began taking photographs of the scene, including several that included Mr. Hunter and Mr. Beausilien. (Dkt. No. 116 at 21:3-6; Dkt. No. 118 at 121:5-13.) While Mr. Hunter walked towards his car, Mr. Beausilien began arguing with Officer Schmidt about why his photograph was being taken. (Dkt. No. 115 at 161:9-17; Dkt. No. 116 at 21:18-21.) Officer Durell again instructed the crowd of onlookers, including Mr. Hunter and Mr. Beausilien, to move further back and to stand behind the gas pumps, which were also on the property of the AM/PM. (Dkt. No. 115 at 162:1-20; Dkt. No. 116 at 22:8-18, 47:5-10; Dkt. No. 118 at 128:20-25.) They complied. (Dkt. No. 115 at 11-12; Dkt. No. 116 at 23:17-24:4.)

Meanwhile, after conferring with Officer Durell, Officer Schmidt entered the AM/PM store to contact the store clerk and "see if they still wanted Mr. Hunter and Mr. Beausilien on the property." (Dkt. No. 117 at 91:1-9, 167:14-168:1; Dkt. No. 118 at 129:16-21.) Officer Durell explained that they were "trying to find another alternative to arresting [Mr. Hunter and Mr. Beausilien], one that would still get them to leave, and [] were hoping the owner's request to have them leave would do that." (Dkt. No. 117 at 91:11-92:4.) Once inside the store, Officer Schmidt asked the store clerk, Ms. Pajarillo, if she wanted Mr. Hunter and Mr. Beausilien trespassed from the property. Officer Schmidt testified that, at no point in time did he suggest to her that they be trespassed, but instead, that she specifically "ask[ed] that they be trespassed." (Dkt. No. 118 at 131:16, 131:19-21.) In particular, Officer Schmidt testified that Ms. Pajarillo told him that" she didn't know [Mr. Hunter and Mr. Beausilien], but she had witnessed them in the parking lot, and noticed they were not patronizing the business" and that "she wanted them to

1 leave." (Id. at 131:3-15.)  Officer Schmidt testified that he filled out a notice of trespass form "at

2 the request of the employee at the store."  (Id. at 133:1-7.)  In contrast, Ms. Pajarillo testified

3 that, although an officer asked her to trespass someone from the property that night, she did not

4 do it.  (Dkt. No. 117 at 158:20-159:15.)  Instead, Ms. Pajarillo asked "Why?"  (Id. at 160:14-

5 16.)[1]

6

_____

7    [1] The Court notes that it was readily apparent from Ms. Pajarillo's testimony and
disposition at trial that she did not initiate the trespass against Mr. Hunter and Mr. Beausilien.  In
8  relevant part, she testified as follows:

9       Q:  Did you see other people out there by the accident?

10      A:  A lot of people are watching the accident there. . . .

        Q:  At any point, did you ask for the police to trespass someone from the store that night?

11      A:  No. . . .

12      Q:  Did an officer come into your store?

        A:  Yeah.

13      Q:  And did that officer ask you to trespass somebody that night?

14      A:  Yes, sir. . . .

        Q:  And you didn't do it?

15      A:  No.

16      Q:  Did the officers tell you why they wanted you to trespass this person?

17      A:  Yes. . . .

        Q:  Did they talk to you about a car at all?

18      A:  Yeah. . . . He said – he come in, inside the store, and ask me if I want the two cars to
            have a trespass, and they don't – I don't know why they're parking in our parking lot.
19          I told – I asked the officer why.  They don't come – they don't even come inside the
            store.  They're just watching the [accident scene]. . . .

20      Q:  When the officer asked you to trespass someone, did you know who they wanted you
            to trespass?

21      A:  No, I don't see them. . . .

22      Q:  I see.  So it was the officer who asked – who pointed out the car?

23      A:  Yeah. . . .

24 (Dkt. No. 117 at 157:24-164:19)

Officer Schmidt emerged from the store and announced to Mr. Hunter and Mr. Beausilien that "they needed to leave the property at the request of the employee," and if they did not, they would be arrested for trespassing.[2] (Dkt. No. 115 at 164:24-165:3; Dkt. No. 116 at 17-19; Dkt. No. 118 at 132:9-13, 149:7-10.) Mr. Hunter told Officer Schmidt, "I'll leave as soon as I make this phone call" to find a ride for Mr. Beausilien. (Dkt. No. 116 at 25:11-26:19, 47:24-48:15.) Mr. Beausilien asked "Are you serious?" (Dkt. No. 115 at 161:19-24, 165:10-11.) Before he could turn to leave, Officer Durell grabbed Mr. Beausilien's shoulder and said "Too late." (Id. at 165:11-21, 166:6-7.) Another officer grabbed Mr. Beausilien's arm. (Id. at 166:9-12.) Initially, Mr. Beausilien resisted but once he realized he was being arrested, he put his hands behind his back and was handcuffed. (Dkt. No. 115 at 166:13-167:5.) Once Mr. Beausilien was in handcuffs, Mr. Hunter opened the driver's side door of his car. (Id. at 167:12-17; Dkt. No. 116 at 29:1-3.) At that point, Officer Durell "speed walk[ed]" straight towards Mr. Hunter, slammed his car door with his left hand, pushed Mr. Hunter against the car with his right hand, placed Mr. Hunter's hands behind his back, and placed him in a neck restraint. (Dkt. No. 115 at 167:21-169:17; Dkt. No. 116 at 32:5-331, 34:1-8.) Officer Durell told him to stop resisting arrest. (Dkt. No. 116 at 32:21-33:1.) Mr. Hunter tried to speak, but was unable to. (Dkt. No. 115 at 173:4-11; Dkt. No. 116 at 34:9-21.) Mr. Hunter felt like he could not breathe and thought he was going to pass out. (Dkt. No. 116 at 34:9-21, 35:2-4.)

---

[2] The record indicates that Officer Schmidt filled out and signed a trespass notice at some point *after* Mr. Hunter was arrested. (Dkt. No. 118 at 133:1-9.) Mr. Hunter was not served with the trespass notice, if at all, until after he was in handcuffs. (Id. at 134:6-135:9.) However, Officer Schmidt checked a box on the notice indicating that Mr. Hunter had been "verbally advised" of the notice. (Id. at 63:3-64:7.) Officer Schmidt also checked the box on the notice indicating that the trespass was "permanent," but left blank the box indicating whether the AM/PM had a valid trespass letter on file with the Federal Way Police Department. (Id., 142:8-25.) These facts were discussed only outside of the jury's presence.

## II.    Jury Trial

The jury trial commenced on July 9, 2018, and lasted six days.  At the close of evidence, Defendants moved for a directed verdict under Federal Rule of Civil Procedure 50(a).  (Dkt. No. 118 at 42:3-55:17.)  Defendants argued that Officer Durell was entitled to qualified immunity and that Mr. Hunter had failed to present evidence that would justify punitive damages.  The Court denied both motions and the jury was excused to deliberate.  After a day of deliberating, the jury returned its verdict on July 17, 2018.  (Dkt. No. 86.)  The jury found that Officer Durell used excessive force in violation of the Fourth Amendment and awarded Mr. Hunter $40,000 in actual damages and $600,000 in punitive damages.  (Id.)

Defendants' Rule 50(b) Motion for Judgment as a Matter of Law raises the same arguments as their Rule 50(a) Motion.  (Dkt. No. 130.)  Defendants' Motion for a New Trial raises five additional arguments, including: (1) that the instructions to the jury and the evidence presented invited the jury to speculate on the lawfulness of the arrest; (2) that evidence concerning race was erroneously admitted; (3) that evidence of Mobile Digital Computer communications was erroneously admitted; (4) that Professor Gilbertson was not qualified to opine on Officer Durell's use of force; (5) that the jury was not given special interrogatories; and (6) that the jury was not given the opportunity to hear evidence of Officer Durell's personal finances before awarding punitive damages.  (Dkt. No. 129.)

These motions are now before the Court.

**Discussion**

**I.  Motion for New Trial**

     **A.  Legal Standard**

Under Federal Rule of Civil Procedure 59(a), a court may grant a motion for a new trial for reasons including "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007) (quoting <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940)).  The Court has substantial discretion in denying a motion for a new trial, <u>Allied Chem. Corp. v. Daiflon, Inc.</u>, 449 U.S. 33, 36 (1980), and the motion should be granted only if "having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>Landes Const. Co. v. Royal Bank of Canada</u>, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (citation omitted).  In making this determination, the Court "can weigh the evidence and assess the credibility of the witnesses." <u>Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.</u>, 762 F.3d 829, 842 (9th Cir. 2014) (citation omitted).  Indeed, the Court has "the duty . . . to weigh the evidence as [the Court] saw it, and to set aside the verdict of the jury . . . where, in [the Court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." <u>Molski</u>, 481 F.3d at 729 (citations omitted) (alterations in original).

While Defendants contend that the Court committed error in its evidentiary rulings and jury instructions, these claims, whether considered individually or cumulatively, are without merit and do not warrant a new trial.

**B. Evidence and Jury Instructions Concerning Lawfulness of the Arrest**

Defendants contend that Officer Durell is entitled to a new trial because the jury was erroneously invited to speculate that he did not have probable cause to arrest Mr. Hunter. In particular, Defendants claim that the Court erred by instructing the jury that "[w]hether an arrest is lawful or unlawful is a question for the court to decide," by permitting them to consider the elements of the underlying crimes for which he was arrested, and by permitting them to hear evidence and argument concerning the lawfulness of Mr. Hunter's arrest. (See Dkt. No. 80 at 19-20.) Defendants also claim that the Court erred by instructing the juries to consider the relative culpability of the parties. (Id.)

At this point, the Court finds it necessary to provide a summary of the relevant procedural history: This case was initially assigned to the Honorable Judge Robert S. Lasnik. Before trial, Judge Lasnik granted partial summary judgment for Defendants, including on Mr. Hunter's claims for false arrest and false imprisonment. (Dkt. No. 39.) In his order, Judge Lasnik concluded that the officers had probable cause to arrest Mr. Hunter for trespass. (Id.) Judge Lasnik concluded that he could not find probable cause, as a matter of law, to arrest for obstruction. (Id.) The case was then reassigned to this Court. (Dkt. No. 40.)

After hearing the evidence at trial, the Court raised concerns as to whether there was probable cause for the trespass and whether the trespass was legitimate. (See Dkt. No. 117 at 196:2-20, 237:2-14.) In particular, the Court noted that Officer Durell repeatedly commanded Mr. Hunter and Mr. Beausilien to stand on the property of the AM/PM; that after doing so, Officer Durell and Officer Schmidt conferred and devised a plan to have them removed from the same property from trespass; and that the store clerk, Ms. Pajarillo, never requested the trespass. (Id.) Based upon this evidence, the Court concluded that—contrary to Judge Lasnik's earlier

1  ruling—it could not say that the arrest was lawful as a matter of law.  Accordingly, the Court

2  determined that, under Velazquez v. City of Long Beach, 793 F.3d 1010 (9th Cir. 2015), it could

3  not instruct the jury that "a seizure of a person is unreasonable under the Fourth Amendment if a

4  police officer uses excessive force in making a *lawful arrest*," as provided in the Ninth Circuit's

5  Model Civil Jury Instructions.  See 9th Cir. Manual of Model Civil Jury Instructions, No. 9.25

6  (emphasis added).  The Court instead instructed the jury that "a seizure of a person is

7  unreasonable under the Fourth Amendment if a police officer uses excessive force in making an

8  *arrest*."  (Dkt. No. 80 at 19) (emphasis added).  The Court also instructed the jury that "[t]he

9  force used in making an arrest may be excessive regardless of whether an arrest is lawful or

10  unlawful" and "[w]hether an arrest is lawful or unlawful is a question for the court to decide."

11  (Id.)  The Court instructed the jury on the elements of the crimes for which Mr. Hunter was

12  arrested—criminal trespass in the second degree, obstructing a law enforcement officer, and

13  resisting arrest—and the penalties for each, in order to assist them in evaluating the nature and

14  severity of these crimes.  (Id. at 19-20.)

15      Defendants do not dispute that whether an arrest is or is not lawful is relevant to an

16  excessive force inquiry, but argue that under Velazquez, the jury should have been informed that

17  the arrest was lawful.  (Dkt. No. 115 at 5:14-7:8, 10:3-1123.)  The Court disagrees with this

18  reading of Velazquez, and concludes that instructing the jury that the arrest was lawful would

19  have "removed critical factual questions that were within the jury's province to decide."

20  Velazquez, 793 F.3d at 1027.

21      In Velazquez, the plaintiff sued the City of Long Beach, the Long Beach Police

22  Department, and the responding officers under 42 U.S.C. § 1983 for unlawful arrest and

23  excessive force.  Id. at 1016.  After the close of evidence at trial, the defendants filed a Rule

24

50(a) motion for judgment as a matter of law. Id. at 1017. The district court granted the motion

with respect to the unlawful arrest claim, and submitted only the excessive force claim to the

jury. Id. Based upon the Ninth Circuit's Model Jury Instruction, No. 9.25, the district court

instructed the jury that "a seizure of a person is unreasonable under the Fourth Amendment if a

police officer uses excessive force in making a *lawful arrest*." Id. at 1026 (emphasis in original).

The district court did not instruct the jury in the elements of the crimes for which the arrest had

been made. Id. The Ninth Circuit reversed, finding that "under Graham . . . the grant of the

Rule 50(a) motion on the lawfulness of the arrest, in conjunction with the district court's

instructions on the excessive force claim, improperly influenced the jury's consideration of

[plaintiff]'s excessive force claim." Id. While recognizing that "the excessive force and false

arrest factual inquiries are distinct," such that "establishing a lack of probable cause to make an

arrest does not establish an excessive force claim" the court explained that "the facts that give

rise to an unlawful detention or arrest can factor into the determination whether the force used to

make the arrest was excessive." Id. at 1024 (citing Beier v. City of Lewiston, 354 F.3d 1058,

1064 (9th Cir. 2004) and Graham v. Connor, 490 U.S. 386, 394-97 (1989)). Accordingly, the

court held that by instructing the jury that the arrest was lawful and by failing to instruct as to the

elements of the crimes for which probable cause must have existed, the district court "effectively

required the jury to presume that the arrest *was* constitutionally lawful, and so not to consider

facts concerning the basis for the arrest. Doing so removed critical factual questions that were

within the jury's province to decide." Id. at 1027 (emphasis in original).

While Defendants maintain that Officer Durell was "entitled to rely on Officer Schmidt's

assertion the store clerk wanted Mr. Hunter to leave" (Dkt. No. 129 at 4), the jury heard that

Officer Durell conspired with Officer Schmidt to have them trespassed from that same property.

(See, e.g., Dkt. No. 117 at 90:25-91:13 ("Officer Schmidt and I spoke, and he went inside to go

contact the AM/PM employee. . . . He was going to see if they still wanted Mr. Hunter and Mr.

Beausilien on the property. . . . We were trying to find another alternative to arresting them, one

that would still get them to leave, and we were hoping the owner's request to have them leave

would do that."); 91:20-92:4 ("My hope was that they would want to avoid being issued the

trespass notice so they could still patronize the business later, and they would just comply with a

private business owner's request since law enforcement's request didn't seem to be working.");

Dkt. No. 118 at 74:2-18 ("We had tried several different methods, [including] 'You need to step

back,' 'You need to leave,' then a warning, and then 'If you don't leave, you could be arrested,'

and then, finally, 'The manager doesn't want you here. You need to leave, or you will be

arrested,' and they still wouldn't leave.").)  The jury heard that, prior to having Mr. Hunter and

Mr. Beausilien trespassed, Officer Durell ordered them to stand on the AM/PM property, but

nevertheless wrote in his report that "they didn't appear to have any legitimate business at the

AM/PM," meaning Mr. Hunter "wasn't using the property for what it's meant to be used for."

(Dkt. No. 117 at 147:17-148:10, 185:4-10.)  The jury also heard conflicting testimony from

Officer Schimdt and Ms. Pajarillo concerning who requested the trespass.  Based upon the

entirety of the evidence, the jury reasonably could have found that Officers Schmidt and Durell's

testimony lacked credibility, particularly with respect to the propriety of the arrest for trespass.

As in Velazquez, the evidence did not give rise to "but one reasonable conclusion" that Mr.

Hunter's arrest was lawful.  Velazquez, 793 F.3d at 1021.  To the contrary, it strongly suggested

that it was predicated upon a manufactured trespass.

Considering the entirety of the evidence, the Court concludes that it was not error to

instruct the jury with respect to the lawfulness of the arrest or the parties' relative culpability

1 (i.e., which party created the dangerous situation and which party is more innocent). Under the

2 circumstances, these instructions allowed the jury to properly discharge its duty. Therefore, the

3 Court DENIES Defendants' Motion for a New Trial with respect to this issue.

### C. Evidence Concerning Mr. Hunter's Race

5 Defendants contend that Officer Durell is entitled to a new trial because the Court

6 erroneously admitted evidence and allowed "repeated innuendo and speculation" that Officer

7 Durell subjected Mr. Hunter to differential treatment based upon his race. While Defendants are

8 correct that Mr. Hunter did not bring an equal protection claim, whether assumptions were

9 made—rightly or wrongly, inadvertently or otherwise—was certainly part of the case, and there

10 was no way to prevent the jury from observing that Officer Durell is Caucasian, while Mr.

11 Hunter and Mr. Beausilien are African American. Accordingly, the Court explained that, while

12 counsel would not be permitted to argue that Officer Durell was racist or that his actions were in

13 any way motivated by racial animus, both sides would be permitted to introduce *facts* related to

14 race. (Dkt. No. 118 at 38:5-39:7.) This is precisely what occurred at trial. For example, the jury

15 heard that Officer Durell described Mr. Hunter and Mr. Beausilien as "black males" in his police

16 report, but did not describe any other witnesses by race. (Dkt. No. 117 at 138:22-24.) The jury

17 heard that Officer Durell treated Mr. Hunter and Mr. Beausilien differently than Mr. Anderson,

18 despite the fact that they were the first to arrive on scene (i.e., that he asked Mr. Hunter and Mr.

19 Beausilien whether they were involved in the accident, but didn't think to ask Mr. Anderson

20 whether he was involved; that he never gave Mr. Hunter or Mr. Beausilien a witness report to

21 complete, but did give one to Mr. Anderson; that he never asked Mr. Hunter or Mr. Beausilien

22 their names, etc.). (Dkt. No. 117 at 83:18, 143:1-12, 191:20-22; Dkt. No. 118 at 76:9-18, 97:6-

23 14, 101:6-102:6.) While the police report itself was excluded, Officer Durell had ample

24

opportunity to explain his use of racial descriptors and differential treatment of witnesses.  (See, e.g., Dkt. No. 117 at 151:6-14 (Q:  "I find it interesting that in your report, the people that are listed who are white, it doesn't say 'white male.'"  A:  "That would be because of the initial dispatch description of the passenger seen with the suspect. . . ."); Dkt. No. 118 at 96:1-97:5 (Q: "[W]hat information did you have about the description of the driver of the Dodge Ram before you contacted Mr. Wells, Mr. Beausilien, and Mr. Hunter?"  A: "One of the descriptions on there was it could have been a black male in his 20s. . . . I knew I was looking for a male driver who was either a Hispanic male or a black male, based on two people who had called in to report who the driver was.").)

The Court concludes that it was not error to admit evidence of facts concerning race, and therefore DENIES Defendants' Motion for a New Trial with respect to this issue.

### D.  Evidence of Mobile Digital Computer Communications

Defendants contend that Officer Durell is entitled to a new trial because the Mobile Digital Computer ("MDC") communications were inadmissible under Federal Rule of Evidence 404(b) and Graham.  The MDC communications reflected an internal exchange on July 7, 2012, in which Officer Durell stated "I think they [the Federal Way Police Department] want me out of the one to lessen my UOF [use of force]. . . . Can't control UOF.  Ppl try to fight me! All self defense bro."  (Dkt. No. 118 at 88:4-89:13.)  As a result of the improper MDC communication, Officer Durell received a ten-day suspension and was removed from his position as a defensive tactics instructor for six months.  (Dkt. No. 118 at 3:5-12; 15:8-16:3.)

While the MDC communication would otherwise be inadmissible, the Court determined that Officer Durell opened the door to its use for impeachment purposes when he testified at length about his expertise in defensive tactics and his role as a trainer of other officers.  (Dkt. No.

117 at 38:11-12, 41:11-50:15.)  In doing so, Officer Durell created the impression that he was able to apply his training consistently and in a controlled manner.  (See, e.g., Dkt. No. 117 at 49:23-50:1 (Q: "Including your time in trainings, about how many total times have you used an LVNR control hold on another person?" A: "I would estimate hundreds."); 50:10-15 (Q: "There's been some testimony in this case that when you applied the LVNR control hold on Mr. Hunter, that you had an arm across the front of his neck, another arm crossed up in a T shape . . . Is that something you've ever been trained to do?" A: "No."); 50:22-51:2 (Q: "Have you ever received training on how to apply an LVNR hold in any way different than what you've demonstrated today?" A: "No."); 51:3-6 (Q: "Have you ever applied an LVNR control hold on anyone in any manner different than what you've demonstrated for the jury today?" A: "No. . . . Because that's how I was trained to apply an LVNR control hold, and that's – I stick with my training.").)

In contrast, the MDC communications indicated that he did *not* feel he had control over his use of force and perceived that the Federal Way Police Department had similar concerns.[3] While Defendants contend that communication with suspects is not a component of defensive tactics, it was reasonable for the jury to believe that it was based on Officer Durell's own testimony.  (See, e.g., Id. at 32:22-25 ("Broadly, defensive tactics are techniques that officers are trained in to arrest people."); Dkt. No. 118 at 72:8-13 (Q: "Is there any verbal or nonphysical

_____

[3] These concerns, along with the MDC communications, were never disclosed by Defendants during discovery, either to Mr. Hunter or to Defendants' own expert, Lieutenant Ovens.  The significance of these concerns was underscored by Lieutenant Thomas F. Ovens, who testified that, had he known that the Federal Way Police Department was considering suspending Officer Durell as a defensive tactics instructor, this would have been a consideration in his assessment of (1) the veracity of Officer Durell's statements concerning the degree of force he used on Mr. Hunter and (2) whether he would have taken the case in the first instance. (See Dkt. No. 110 at 66:13-24.)

method which is part of your defensive tactics training?" A: "Officer presence and voice commands are part of the defensive tactics training, and issuing clear commands, such as 'You are under arrest' or 'Put your hands behind your back' is also part of our training."); 72:14-16 (Q: "Do you teach any nonphysical methods when you train?" A: "The ones I just stated, yes.").)

Considering the entirety of the evidence, the Court does not conclude that it erred in admitting in admitting evidence of the MDC communications.

### E. Professor Gilbertson's Qualifications

Defendants contend that Mr. Hunter's expert, Professor Greg Gilbertson, was not qualified to opine on the reasonableness of Officer Durell's use of the LVNR hold. In particular, Defendants argue that Professor Gilbertson had no experience with the use of the LVNR or with how law enforcement officers in Washington are trained to use the LVNR, and despite his lack of qualifications "was permitted to testify that the LVNR hold was deadly force, that it should never have been used to effect a misdemeanor arrest, and that it was excessive." (Dkt. No. 129 at 10.)

The Court is not persuaded that Professor Gilbertson's testimony concerning the LVNR was outside the scope of his expertise. Professor Gilbertson testified at length as to his decades of experience in police training, both internationally and domestically. With respect to the LVNR, Professor Gilbertson testified that "some agencies approve it and it's trained in some agencies, and some agencies it's not approved and it's not trained." (Dkt. No. 116 at 133:12-14.) Contrary to Defendants' claim, whether and how law enforcement officers *in Washington State* are trained to use the LVNR is irrelevant to the excessive force inquiry, which asks only whether an officer's use of force is "objectively unreasonable" under the circumstances.

Further, Defendants cannot show that they were prejudiced by Professor Gilbertson's testimony, as their own expert, Lieutenant Ovens, testified that (1) in his work as police officer, he never used an LVNR hold on anyone and (2) while the Washington State Police Academy trains officers on the LVNR, the Seattle Police Department does not, as it considers neck and carotid artery restraints to be deadly force. (Dkt. No. 119 at 15:23-16:5, 45:21-22, 46:2-4, 58:4-10.)

The Court concludes that Professor Gilbertson was qualified and that his testimony did not improperly influence the jury's verdict, and therefore DENIES Defendants' Motion for a New Trial with respect to this issue.

**F. Special Interrogatories**

Defendants contend that the jury should have been given special interrogatories in order to determine how it resolved factual disputes for purposes of qualified immunity. In particular, Defendants claim that, in order for the Court to determine whether Officer Durell's use of force was "clearly established" as unlawful under the circumstances, it needed to consider "whether Mr. Hunter resisted arrest," "whether Officer Durell informed Mr. Hunter that he was under arrest and/or told him to put his hands behind his back, whether Mr. Hunter heard those commands, and whether he followed those commands." (Dkt. No. 129 at 12.)

The Court has broad discretion in deciding whether to give special interrogatories to the jury. See, e.g., Ruvalcaba v. City of Los Angeles, 167 F.3d 514, 522 (9th Cir. 1999) ("[W]hether to submit special interrogatories to the jury is a matter committed to the discretion of the district court.") (citation omitted). On the other hand, a court may abuse its discretion "by submitting special interrogatories that are likely to mislead or confuse the jury or inaccurately state the

1    issues." <u>Frank Briscoe Co., Inc. v. Clark Cnty.</u>, 857 F.2d 606, 614-15 (9th Cir. 1988) (citation

2    omitted).

3          Here, the Court did not provide special interrogatories because it found that doing so

4    would have confused the jury and would not have assisted the Court in its qualified immunity

5    analysis.  Before trial, Defendants proposed the following special interrogatories:

6          1.   Did it take multiple officers to place Mr. Beausilien under arrest?

7          2.   Was Mr. Beausilien resisting arrest?

8          3.   Did the plaintiff walk towards Officer Durell when Officer Durell was in the process
               of arresting Mr. Beausilien?

9          4.   Did Officer Durell instruct the plaintiff to stop approaching him while he was
10              arresting Mr. Beausilien?

11         5.   Did the plaintiff stop approaching Officer Durell after Officer Durell instructed him
               to stop approaching?

12         6.   Did Officer Durell inform the plaintiff that he was under arrest before using any force
13              to effect that arrest?

14         7.   Did the plaintiff tell Officer Durell he was not going to leave after Officer Durell told
               the plaintiff he was under arrest?

15         8.   Did the plaintiff open his car door after Officer Durell told the plaintiff he was under
               arrest?

16
17         9.   Did Officer Durell attempt to place the plaintiff's left arm behind his back before
               using a Lateral Vascular Neck Restraint (LVNR) hold?

18         10.  Did the plaintiff physically resisist Officer Durell's attempt to get the plaintiff's left
               arm behind his back [] before Officer Durell used the LVNR hold?

19
20         11.  Were the plaintiff and Officer Durell positioned between two cars parked in the
               AM/PM parking lot before Officer Durell used the LVNR hold?

21         12.  When Officer Durell used the LVNR hold on the plaintiff, did he apply any pressure
               to the plaintiff's neck?

22
23         13.  When Officer Durell used the LVNR hold on the plaintiff, did Officer Durell obstruct
               his ability to breathe?

24

14. When Officer Durell used the LVNR hold on the plaintiff, did Officer Durell cause the plaintiff to lose consciousness?

15. For how many seconds did Officer Durell keep his arm around the plaintiff's neck?

16. Did Officer Durell release the LVNR hold after the plaintiff stopped resisting arrest?

17. Did Officer Durell release the LVNR hold soon after Officer Schmidt came over to assist in bringing the plaintiff's right arm behind the plaintiff's back?

18. At the time Officer Durell used the LVNR hold on the plaintiff, did Officer Durell have reason to believe that the plaintiff was resisting arrest?

19. At the time Officer Durell used the LVNR hold on the plaintiff, did Officer Durell have reason to believe that the plaintiff was attempting to flee?

20. At the time Officer Durell used the LVNR hold on the plaintiff, did Officer Durell have reason to believe that, if not restrained, the plaintiff posed a risk of providing aid to Mr. Beausilien in resisting arrest?

21. At the time Officer Durell used the LVNR hold on the plaintiff, did Officer Durell have reason to believe that, if not restrained, the plaintiff posed a risk of harm to Officer Durell or other officers on the scene?

(Dkt. No. 65 at 1-5.)

The Court explained that, due to the extent of disputed facts in the case, the qualified immunity analysis did not involve merely deciding between "two different alternatives," one of which would result in qualified immunity and the other of which would not.  (Dkt. No. 121 at 45:23-46:13.)  To the contrary, it observed that there were "literally a thousand questions" that might affect the analysis, and explained "I'm just in a quandary as to what I would do with these answers, particularly if I got a mixed bag back, because I don't know how [the jury] would evaluate one over the other."  (Id. at 45:16-22.)  The Court therefore declined to provide the jury with special interrogatories on the verdict form, as was well within its discretion.  See Hung Lam v. City of San Jose, 869 F.3d 1077, 1086 (9th Cir. 2017) (holding that special interrogatories are not required for the purpose of evaluating a post-verdict qualified immunity defense, and noting that "the district court reasoned that, if the jury found [plaintiff's] version of the facts to be true,

1   then [defendant] would not be entitled to qualified immunity, because it is a violation of clearly

2   established law for an officer to use deadly force against someone who poses no threat of serious

3   harm to the officers or others.").

4       The Court concludes that its decision not to give special interrogatories does not warrant

5   a new trial and therefore DENIES Defendants' Motion for a New Trial with respect to this issue.

6       **G.  Evidence of Officer Durell's Personal Finances**

7       Defendants contend that Officer Durell was erroneously deprived of the opportunity to

8   present evidence of his personal finances, and that such evidence should have been considered

9   before the jury awarded punitive damages.

10      Before trial, the Court granted Defendants' Motion in Limine No. 8, which requested that

11  the Court exclude "evidence of Officer Durell's financial condition or ability to pay a punitive

12  damage award, unless the jury first finds liability and awards punitive damages."  (Dkt. No. 46 at

13  16; Dkt. No. 68 at 1-2.)   The Court's Order noted that "[i]n the event of a punitive damages

14  award against him, the Court will permit limited evidence and argument regarding the

15  appropriate amount of punitive damages before the jury deliberates on the issue."  (Dkt. No. 68

16  at 2.)  While Defendants contend that "[a]n officer's personal net worth is a factor the jury

17  should consider when determining the size of a punitive damages award," Defendants (1) did not

18  offer or seek to offer evidence of Officer Durell's personal finances during the trial; (2) did not

19  include any exhibits concerning Officer Durell's personal finances on their exhibit list (Dkt. No.

20  67); and (3) did not provide any grounds for their objection in the form of controlling case law

21  during the trial.  (See Dkt. No. 119 at 140:3-141:18); see also Obsidian Fin. Grp., LLC v. Cox,

22  740 F.3d 1284, 1289 (9th Cir. 2014) ("To preserve an argument about a jury instruction . . . a

23  party generally must make a specific contemporaneous objection to the instruction 'on the

24

record, stating distinctly the matter objected to and the grounds for the objection.'"). Finally, in the case cited by Defendants in support of their motion—<u>Larez v. Holcomb</u>, 16 F.3d 1513 (9th Cir. 1994)—the Ninth Circuit held that the trial court erred by allowing counsel to instruct the jury that an individual officer would be indemnified by the city for any punitive damages assessed against him, as "[i]nforming the jury of indemnification thus would provide a windfall to plaintiffs at taxpayers' expense, with little appreciable increase in deterrence." <u>Id.</u> at 1521. It did not, as Defendants suggest, require that evidence of the officer's personal net worth be offered to the jury.[4]

The Court concludes that Defendants were not prejudiced by the lack of evidence regarding Officer Durell's personal finances, and therefore DENIES Defendants' Motion for a New Trial with respect to this issue.

## II. Motion for Judgment as a Matter of Law

### A. Legal Standard

The Court may grant Defendants' renewed motion for judgment as a matter of law only if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-movant. <u>See</u> Fed. R. Civ. P. 50(a). The Court must view all evidence and draw all reasonable inferences in favor of the non-movant. <u>Ostad v. OHSU</u>, 327 F.3d 876, 881 (9th Cir. 2003). Granting a motion for judgment as a matter of law is proper "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury," such

---

[4] While the panel's opinion in <u>Larez</u> includes a citation to Judge Higginbotham's dissent in <u>Keenan v. Philadelphia</u>, 983 F.2d 459, 477-84 (3rd Cir. 1992) (pointing out tension between deterrent rationale for punitive damages and taxpayer indemnification of punitive awards, and contending that, even where city will ultimately foot the bill, evidence of defendant's *personal* economic worth should be prerequisite to award of punitive damages in the § 1983 context), the Court does not read this citation, without more, as an intent to impose such a requirement in the Ninth Circuit.

that "the jury could have relied only on speculation to reach its verdict." <u>Lakeside-Scott v.</u>

<u>Multnomah Cnty.</u>, 556 F.3d 797, 802-03 (9th Cir. 2009) (citations omitted).

### B. Qualified Immunity

Defendants move for qualified immunity with respect to Officer Durell's use of the

LVNR on Mr. Hunter. The doctrine of qualified immunity protects government officials "from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555

U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). The doctrine is

intended to balance "the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when

they perform their duties reasonably." <u>Id.</u>

Even where a constitutional violation has occurred, qualified immunity shields an officer

from civil liability where the right was not "clearly established" at the time of the challenged

conduct, "such that 'every reasonable official' would have understood that what he is doing

violates that right." <u>Morales v. Fry</u>, 873 F.3d 817, 821 (9th Cir. 2017) (quoting <u>Ashcroft v. al-</u>

<u>Kidd</u>, 563 U.S. 731, 735, 741 (2011)). To be "clearly established," "existing precedent must

have placed the statutory or constitutional question beyond debate," although there need not be a

case "directly on point." <u>White v. Pauly</u>, 137 S.Ct. 548, 551-52 (2017) (internal quotation marks

and citations omitted). In this regard, an officer can still be on notice that his conduct violates

established law even in "novel factual circumstances." <u>See</u> <u>Mattos v. Agarano</u>, 661 F.3d 433,

442 (9th Cir. 2011) (en banc). "Otherwise, officers would escape responsibility for the most

egregious forms of conduct simply because there was no case on all fours prohibiting that

particular manifestation of unconstitutional conduct." <u>Id.</u> (quoting <u>Deorle v. Rutherford</u>, 272

F.3d 1272, 1286 (9th Cir. 2001)); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) ("[O]fficials

can still be on notice that their conduct violates established law even in novel factual

circumstances."); <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) ("[I]n an obvious case, the

[factors set forth in <u>Graham v. Connor</u>, 490 U.S. 386 (1989)] can clearly establish the answer,

even without a body of relevant case law.") (internal quotation marks and citations omitted).

Defendants contend that no precedent placed the unlawfulness of Officer Durell's

conduct "beyond debate," and that "[t]o the contrary, courts have recognized that brief neck

restraints are *not* clearly unlawful." (Dkt. No. 130 at 4-5 (emphasis in original).) While

acknowledging that no case is directly on point, the Court concludes that, based upon available

precedent at the time of the incident, a reasonable officer would have known that it violated

clearly established law in the Ninth Circuit to use a choke hold on a non-resisting suspect. <u>See,</u>

<u>e.g.</u>, <u>Drummond ex rel. Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1059 (9th Cir. 2003)

("The officers—indeed, any reasonable person—should have known that squeezing the breath

from a compliant . . . individual . . . involves a degree of force that is greater than reasonable.");

<u>Knapps v. City of Oakland</u>, 647 F. Supp. 2d 1129, 1158 (N.D. Cal. 2009) (holding that officer

used excessive force when he used a "carotid hold" on an unarmed suspect who was not

resisting, even where department policy permitted use of carotid hold and plaintiff did not lose

consciousness); <u>Atkinson v. Cnty. of Tulare</u>, 790 F. Supp. 2d 1188, 1203-05 (E.D. Cal. 2011)

(finding triable issue where officers applied carotid hold without warning, even where they

believed that plaintiff was armed, was involved in several burglaries with stolen firearms, and

was resisting arrest); <u>Rosenfeld v. Mastin</u>, 2013 WL 5705638, at *6 (C.D. Cal. Oct. 15, 2013)

(finding triable issue where plaintiff provided a false name during a traffic stop, and officers

responded by putting him "into a choke hold without warning or provocation"); <u>Hudson v. City</u>

of San Jose, 2006 WL 1128038, at *3 (N.D. Cal. Apr. 27, 2006) (finding triable issue where officer used "carotid restraint" during a traffic stop in the absence of any conduct by plaintiff "that would give rise to a reasonable belief that he was trying to flee or that would otherwise warrant the level of force employed."). Consistent with this line of cases, a reasonable officer also would have understood that an LVNR could constitute deadly force, such that its use should be thoughtfully prescribed. See also Gahn v. Fujino, 39 F.3d 1187, 1994 WL 587527, at *3 (9th Cir. Oct. 21, 1994) (unpublished opinion observing that a choke hold "can cause serious bodily injury or even death."); (Dkt. No. 119 at 15:23-16:5, 46:2-4, 58:4-10 (Lieutenant Ovens testifying that the Seattle Police Department considers neck and carotid artery restraints to be deadly force and does not train its officers in the use of the LVNR).)

Moreover, because an excessive force analysis "'requires careful attention to the facts and circumstances of each particular case,'" the Court must "look at the intrusiveness of all aspects of the incident in the aggregate." Robinson v. Solano Cnty., 278 F.3d 1007, 1013-14 (9th Cir. 2002) (citations omitted). Here, Officer Durell used what is considered by many police departments to be deadly force in response to an *exceptionally* minor infraction. Considering his use of force in relation to the events which preceded it, the Court concludes that this is "one of those rare cases" in which a constitutional violation was "'obvious' that [it] must conclude— based on the jury's finding—that qualified immunity is inapplicable, even without a case directly on point." A.D. v. Cal. Highway Patrol, 712 F.3d 446, 455 (9th Cir. 2013) (citation omitted). Viewed in favor of the verdict, the record indicates that: (1) Mr. Hunter and Mr. Beausilien were at no point suspects in the accident; (2) Officer Durell observed Mr. Hunter and Mr. Beausilien escorting Mr. Wells back to the accident scene; (3) during his investigation, Officer Durell repeatedly instructed Mr. Hunter and Mr. Beausilien to stand on the property of the AM/PM; (4)

Mr. Hunter and Mr. Beausilien complied with those orders; (5) Officers Durell and Schmidt devised a plan to have Mr. Hunter and Mr. Beausilien trespassed from the AM/PM property; (7) Officers Durell and Schmidt informed Mr. Hunter and Mr. Beausilien that they were being trespassed, and ordered them to leave the property; (8) as Mr. Hunter was attempting to comply with that order, Officer Durell placed him in a chokehold with no warning.

With these facts in mind, it should have been obvious to Officer Durell that his use of force against Mr. Hunter was unreasonable under Graham. First, the crime that prompted the use of force—misdemeanor trespass—was not only not severe, it was *non-existent* until Officers Durell and Schmidt manufactured it over the objection of Ms. Pajarillo[5]. While the Ninth Circuit has explained that "establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa," it has also recognized that "the facts that gave rise to an unlawful detention or arrest can factor into the determination whether the force used to make the arrest was excessive." Velazquez, 793 F.3d at 1024. "Underlying Graham's objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force: it is the *need* for force which is at the heart of the Graham factors. . . . Where officers are presented with circumstances indicating that no crime was committed, the 'severity of the crime at issue' factor is necessarily diminished as a justification for the use of force . . ." Id. at 1025 (internal quotation marks and citations omitted) (emphasis in original); see

---

[5] There is no question that it should have been obvious to Officer Durell that arresting a person without probable cause is unreasonable. See, e.g., McKenzie v. Lamb, 738 F.2d 1005, 1007 (9th Cir. 1984) (citing Beck v. Ohio, 379 U.S. 89, 90-91 (1964)); Manuel v. City of Joliet, III, 137 S.Ct. 911, 920 (2017). Likewise, it should have been obvious that arresting a person for trespass where there was no trespass was unreasonable. (See Dkt. No. 119:72:15-73:25 (Lieutenant Ovens testifying that "[i]f the store clerk did not authorize the trespass, then that would not be an appropriate arrest for that.").)

also Blankenhorn v. City of Orange, 485 F.3d 463, 481 (9th Cir. 2007) ("[F]orce is only justified when there is a need for force.").

Second, there was no indication that Mr. Hunter was armed or otherwise posed a threat to the safety of the officers or others, that he had committed a violent crime, or that a violent crime was about to occur.  Graham, 490 U.S. at 396.  Officer Durell testified that Mr. Hunter never touched him, or made any threatening movements or statements towards him, and that Mr. Hunter's only infraction was failing to respond promptly when commanded to leave and attempting to open his car door to do so.  (Dkt. No. 117 at 150:13-24.)  While Officer Durell claims that he "had no idea what [Mr. Hunter's] intentions in getting into [his] car were," and believed Mr. Hunter might be reaching for weapons (Id. at 102:1-14), this entirely unsubstantiated belief, without more, cannot justify the use of deadly force.[6]  This is particularly true here, as Officer Durell had ordered Mr. Hunter to leave the property just seconds before, and Mr. Hunter was attempting to comply with this order.

Finally, there is no indication that Mr. Hunter was resisting arrest or attempting to evade arrest by flight.  Graham, 490 U.S. at 396.  To the contrary, Mr. Hunter was attempting to comply with Officer Durell's order, and the fact that he did not do so promptly cannot justify the use of deadly force.  See, e.g. Thompson v. Rahr, 885 F.3d 582, 595 (9th Cir. 2018) (Christen, J., dissenting) ("When an officer gives a command, a fearful arrestee may require a longer-than-

---

[6] As the Ninth Circuit has explained, police officers "by their choice of a profession . . . have knowingly agreed to subject themselves to some physical jeopardy," as is "inherent in the job of a law enforcement officer."  Washington v. Lambert, 98 F.3d 1181, 1186-87 (9th Cir. 1996).  "While [courts] must not compel police officers to take unnecessary risks, total security is possible, if at all, only in a society that puts a much lesser premium on freedom than does ours.  Therefore, in determining whether [an arrest] was lawful or unlawful, we must consider the risk to the police officers inherent in the situation, but we must also consider the liberty interests all Americans cherish—specifically the freedom from unreasonable searches and seizures guaranteed by the Fourth Amendment to our Constitution."  Id. at 1187.

expected interval to understand the order and follow it.  In the heat of the moment, officers have

interpreted delayed responses as willful refusal to cooperate, or failed to realize that a suspect has

been given inconsistent commands (<u>e.g.</u>, 'Put your hands up!' 'Don't move!'.)") (citations

omitted).

Because a reasonable officer would have known that it violated clearly established law to

use a neck restraint on a non-resisting suspect, and because it would have been obvious that such

use of force was unreasonable under <u>Graham</u>, the Court finds that Officer Durell is not entitled to

qualified immunity, and DENIES Defendants' Motion for Judgment as a Matter of Law with

respect to this issue.

## C.  Punitive Damages

Defendants move for qualified immunity with respect to the jury's award of punitive

damages.  Defendants contend that there is no evidence that Officer Durell engaged in the type

of conduct that would properly allow the issue of punitive damages to be placed before the jury

(<u>i.e.</u>, that he acted with an evil motive or reckless disregard for Mr. Hunter's rights).  The Court

disagrees.  First, while Defendants claim that Officer Durell had probable cause to arrest Mr.

Hunter, such that his manufacturing of the trespass is "immaterial" and "cannot form the basis

for punitive damages" (Dkt. No. 130 at 9), the Court specifically declined to instruct the jury that

the arrest was lawful as a matter of law, and to the contrary, found the manufactured trespass to

be the most remarkable and troubling aspect of the case.  Second, once the jury found that

Officer Durell's actions violated Mr. Hunter's constitutional rights, it was reasonable for it to

consider the issue of punitive damages.  The jury was instructed that "[y]ou may award punitive

damages only if you find that Officer Durell's conduct that harmed Mr. Hunter was malicious,

oppressive or in reckless disregard of the plaintiff's rights. . . ." (<u>See</u> Dkt. No. 80 at 14.)

Viewing the facts in favor of the verdict, a reasonable jury could—and evidently, did— find that manufacturing a trespass and using deadly force against him showed "reckless or callous indifference" to Mr. Hunter's constitutional rights or was "motivated by evil motive or intent." Smith v. Wade, 461 U.S. 30, 56 (1983).  For example, the jury reasonably could have found that Mr. Hunter was a witness to the accident, and that his only intent was to help.  The jury reasonably could have found that Mr. Hunter did help by escorting Mr. Wells back to the accident scene.  The jury reasonably could have found that Officer Durell disregarded these facts and treated Mr. Hunter as a suspect, not a witness.  The jury reasonably could have found that Officer Durell provided inconsistent instructions by ordering Mr. Hunter to stand on the AM/PM property, and then seeking to have him trespassed from the property over the store owner's objection.  The jury reasonably could have found that Officer Durell knew that he did not have probable cause to arrest Mr. Hunter, but did so anyway.  The jury reasonably could have found that Officer Durell knew the Federal Way Police Department had concerns about his use of force, yet decided to use deadly force against Mr. Hunter nonetheless.  Based upon these findings, the jury reasonably could have concluded that Officer Durell's use of deadly force against Mr. Hunter was not only excessive, but malicious, oppressive, and in reckless disregard of his rights.

The Court finds that the punitive damages award against Officer Durell was not improper, and DENIES Defendants' Motion for Judgment as a Matter of Law with respect to this issue.

### D.  Remittitur of Punitive Damages Award

In the alternative, Defendants move for remittitur of the jury's $600,000 punitive damages award, which they claim is excessive in relation to its $40,000 compensatory damages

award and unreasonable given "the degree of reprehensibility" of Officer Durell's conduct. A jury's award of damages is entitled to great deference, and should generally be upheld unless it is "clearly not supported by the evidence" or "only based on speculation or guesswork." In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006) (citation omitted). While it has yet to impose "concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," the Supreme Court has instructed that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003). The Ninth Circuit has recognized that the "rare exception might be a case where 'a particularly egregious act has resulted in only a small amount of economic damages.'" Bains LLC v. Arco Prods. Co., Div. of Atlantic Richfield Co., 405 F.3d 764, 776 (9th Cir. 2005) (quoting State Farm, 538 U.S. at 425)). However, "[w]hen compensatory damages are substantial, then an even lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." State Farm, 538 U.S. at 425. Relevant factors include (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at 418 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). However, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Id. at 419 (quoting Gore, 517 U.S. at 575)). Reprehensibility falls along a scale, with "acts and threats of violence at the top, followed by acts

taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence."  Swinton v. Potomac Corp., 270 F.3d 794, 818 (9th Cir. 2001) (internal quotation marks and citation omitted).

Here, Officer Durell's conduct could well be interpreted as particularly reprehensible. Indeed, the jury's punitive damages award arguably reflects their finding that Officer Durell's use of deadly force showed reckless disregard for Mr. Hunter's health, safety, and constitutional rights.  However, the remaining factors do not support the amount of the punitive damages award:  The punitive damages award is fifteen times that of the compensatory damages award, and significantly exceeds the amounts imposed in other Fourth Amendment excessive force cases.  See, e.g., Knapps, 647 F. Supp. 2d at 1171 (jury awarded $30,000 in punitive damages against first officer and $20,000 against second officer where plaintiff was the subject of an "unnecessary carotid hold" by officer who then colluded with a "fellow officer to fabricate an untruthful story"); Bonner v. Normandy Park, Case No. C07-962RSM, 2009 WL 279070, at *5-7 (W.D. Wash. Feb. 2, 2009) (jury awarded $25,000 in punitive damages where officer tased unarmed plaintiff); Frunz v. City of Tacoma, 468 F.3d 1141, 1144 (9th Cir. 2006) (affirming $111,000 in punitive damages where officers entered plaintiff's home without a warrant, pointed a gun at her head, slammed her to the floor, and cuffed her hands behind her back for about an hour).

Though mindful of the fact that the jury found it appropriate to assess a significant amount of punitive damages against Officer Durell, the Court finds it has no choice but to reduce the amount of the award to a single-digit multiplier to comport with due process as set forth in State Farm.  Accordingly, the Court GRANTS Defendants' request for remittitur, and reduces the punitive damages award to $360,000.

**Conclusion**

Having found that the verdict was not contrary to the clear weight of evidence and that Officer Durell was not entitled to qualified immunity, the Court DENIES Defendants' Motion for New Trial and DENIES Defendants' Motion for Judgment as a Matter of Law. The Court GRANTS Defendants' request for remittitur, and reduces the punitive damages award to $360,000.

The clerk is ordered to provide copies of this order to all counsel.

Dated November 29, 2018.

Marsha J. Pechman
United States District Judge